*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-2054**

State of Minnesota,
Respondent,

vs.

Farah O. Farah,
Appellant.

**Filed October 6, 2014
Affirmed
Reilly, Judge**

Anoka County District Court
File No. 02-CR-12-9179

Lori Swanson, Attorney General, St. Paul, Minnesota; and

James D. Hoeft, Jennifer C. Moreau, Barna, Guzy & Steffen, Ltd., Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Benjamin J. Butler, Assistant Public Defender, St. Paul, Minnesota (for appellant)

        Considered and decided by Reilly, Presiding Judge; Peterson, Judge; and Reyes, Judge.

UNPUBLISHED OPINION

**REILLY**, Judge

Appellant argues that the evidence was insufficient to sustain his conviction for disorderly conduct and that the district court did not make diligent efforts to obtain a certified interpreter. We affirm.

## FACTS

Respondent State of Minnesota charged appellant Farah O. Farah with disorderly conduct and fifth-degree assault after an incident at a medical clinic. On the morning of December 18, 2012, a nurse employed by the Fairview Clinic in Columbia Heights received a telephone call from Farah regarding a prescription. Farah spoke in English. The nurse answered Farah's questions over the phone, and Farah started yelling at her.

Because Farah sounded angry and the nurse perceived what he said to be a threat, the nurse hung up on him. After making the telephone call, Farah showed up at the Columbia Heights clinic. Shortly after his arrival, an employee at the clinic called for police assistance. Police officers arrived after receiving a dispatch that there was a male at the clinic threatening people.

When Columbia Heights Police Officer Sturdevant arrived at the clinic, he saw a man yelling in English in the reception area of the clinic. There were approximately 15 people in the waiting area, all within about 20 feet of one another. After asking Farah to calm down, Farah continued to yell and scream. The police officers escorted Farah to the clinic's front entryway. Farah berated and insulted the officers and told them that, if they issued him a citation, he would kill himself. Per policy, Officer Sturdevant called an

ambulance to transport Farah to a hospital psychiatric unit. From these events, the state tab-charged Farah with disorderly conduct—offensive or abusive behavior, and fifth-degree assault.

The trial date was delayed several times. At all of the pretrial hearings, an interpreter was present, and counsel made no objections regarding the interpreters' qualifications. The jury trial started on October 1.

At the start of the trial, counsel for Farah objected to proceeding with an interpreter who was not certified and argued that diligent efforts were not made to secure a certified interpreter. The district court contacted the court-operations supervisor to determine whether court administration made a diligent effort to secure a certified interpreter. The court-operations supervisor testified regarding his efforts to obtain a certified interpreter.

The district court found that the interpreters were qualified and denied Farah's request for a continuance. The jury found Farah guilty of disorderly conduct and not guilty of fifth-degree assault. Farah appeals.

## DECISION

### I.

In considering a claim of insufficient evidence, our review is limited to a thorough analysis of the record to determine whether the evidence, when viewed in the light most favorable to the conviction, was sufficient to allow the jury to reach its verdict. *State v. Webb,* 440 N.W.2d 426, 430 (Minn. 1989). The reviewing court must assume that "the jury believed the state's witnesses and disbelieved any evidence to the contrary." *State v.*

*Moore*, 438 N.W.2d 101, 108 (Minn. 1989). We will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the charged offense. *Bernhardt v. State*, 684 N.W.2d 465, 476-77 (Minn. 2004).

Farah claims that his conviction must be reversed because his speech did not rise to the level of "fighting words" and was therefore protected by the First Amendment. The disorderly-conduct statute, however, does not limit disorderly conduct to "fighting words." *See* Minn. Stat. § 609.72, subd. 1(3) (2012); *In re Welfare of T.L.S.*, 713 N.W.2d 877, 880 (Minn. App. 2006). The statutory requirements for the offense of disorderly conduct provide that

> [w]hoever does any of the following in a public or private place, . . . knowing, or having reasonable grounds to know that it will, or will tend to, alarm, anger or disturb others or provoke an assault or breach of the peace, is guilty of disorderly conduct, which is a misdemeanor:
> (1) engages in brawling or fighting; or
> (2) disturbs an assembly or meeting, not unlawful in its character; or
> (3) engages in *offensive, obscene, abusive, boisterous, or noisy conduct* or in offensive, obscene, or abusive language tending reasonably to arouse alarm, anger, or resentment in others.

Minn. Stat. § 609.72, subd. 1 (emphasis added).

Farah contends that the state primarily relied on the comments made to the police officers as its basis for the disorderly-conduct conviction. The record refutes this contention. In addition to questioning Officer Sturdevant about the incident outside the clinic, the state developed testimony regarding Farah's conduct inside the clinic and the

4

effect it had on those in the waiting room. And, during closing arguments, the state argued that the evidence presented showed that Farah's yelling and screaming at staff in the clinic's reception area was disorderly conduct.

In *T.L.S.*, we distinguished between disorderly conduct based upon the content of the speech and disorderly conduct based on the manner of the delivery of the speech. 713 N.W.2d at 880-81. The appellant in *T.L.S.* was charged with disorderly conduct after she began shrieking profanities at a police officer in a school's administrative office. *Id.* at 879. On appeal, this court addressed whether probable cause existed to arrest the appellant for a disorderly conduct violation and consequently whether the district court erred by denying a suppression motion. *Id.* at 882.

In determining whether probable cause existed to arrest for disorderly conduct, we reasoned that

> the disorderly shouting of otherwise protected speech or engaging in other 'boisterous or noisy *conduct*' may still trigger punishment under the statute without offending the First Amendment. In that circumstance, it is not the speech itself that triggers punishment; the statute may be applied to punish the manner of delivery of speech when the disorderly nature of the speech does not depend on its content.

*Id.* at 881 (emphasis in original). Based on this framework, we found that although shrieking profanities inside the school administration office did not rise to the level of "fighting words," it did disrupt the school. *Id.* Thus, appellant engaged in boisterous and noisy conduct in violation of the disorderly-conduct statute. *Id.* at 881.

Here, viewing the evidence in the light most favorable to the state, we must assume that the jury believed the testimony of the nurse and Officer Sturdevant. The

5

nurse testified that Farah was "yelling in the lobby." Officer Sturdevant testified that he saw Farah "yelling and causing a scene," that his behavior was "[v]ery aggressive, threatening, loud, [and] intimidating," and that the patients were "visibly shocked" by Farah's behavior inside the clinic. Moreover, once outside, Farah screamed "mother f--kers" at the police officers, and multiple people walking in and out of the clinic heard this and seemed "surprised by [the] behavior." Similar to *T.L.S.*, Farah's conduct occurred in a setting in which yelling and screaming caused a disruption.

Viewed in the light most favorable to the verdict, there is sufficient evidence in the record for the jury to conclude that appellant's actions constituted "boisterous or noisy conduct." The jury could have reasonably believed from the testimony presented that appellant's actions on December 18 caused the other patients and staff in the proximate area to be alarmed. Because we conclude that there was sufficient evidence to support Farah's disorderly-conduct conviction based on conduct alone, we decline to address his arguments regarding the content of his speech.

## II.

Next, Farah argues that he must receive a new trial because the district court erred by appointing nonqualified court interpreters. We disagree.

Decisions involving interpreters are within the district court's discretion, *State v. Perez*, 404 N.W.2d 834, 838 (Minn. App. 1987), *review denied* (Minn. May 20, 1987), and we review these decisions under an abuse of discretion standard. *See State v. Cham*, 680 N.W.2d 121, 126 (Minn. App. 2004), *review denied* (Minn. July 20, 2004) (addressing the appointment of an interpreter).

6

Minnesota Rule of General Practice 8.02(a) requires a district court to first use a certified court interpreter. If no certified court interpreter is available, the district court is then required to use a noncertified interpreter on the statewide roster. Minn. R. Gen. Pract. 8.02(b). If there are no certified or rostered interpreters, the district court may then use noncertified interpreters not on the statewide roster. Minn. R. Gen. Pract. 8.02(c). In order for a noncertified interpreter to be used, the district court must make "diligent efforts to obtain a certified court interpreter as required by Rule 8.02(a) and [if] none [are found] to be available, the court shall appoint a non-certified court interpreter who is otherwise competent." Minn. R. Gen. Pract. 8.02(b).

Farah claims that the district court did not make diligent efforts to obtain a certified interpreter. The Advisory Committee Comment to rule 8.02 states:

> [T]o satisfy the diligent efforts requirement a court must demonstrate that, after receiving a request for an interpreter, the court made prompt attempts to hire a *certified* court interpreter. If the court could not find a certified court interpreter within its judicial district, it must show that it attempted to locate a certified interpreter in another judicial district. If no certified interpreter is available, the court must consider modifying the schedule for the matter before resorting to hiring a non-certified court interpreter.

(Emphasis in original.)

At an August 5 hearing, both parties asked for a continuance of the jury trial date. The trial was continued to September 30. On September 30, interpreters were present and sworn in but the trial was continued to the next day because there was no jury pool present. The district court then requested that the in-court clerk obtain interpreters for the next day.

7

On September 30 and October 1, the district court questioned the court-operations supervisor regarding whether diligent efforts were made to find a certified interpreter. The court-operations supervisor testified that his staff received the interpreter request late in the afternoon the day before trial. The staff, however, had prior knowledge that the one certified Somali interpreter in Minnesota was not available for the trial dates. In light of the trial date's multiple delays and the lack of certified interpreters, the supervisor's testimony establishes that diligent efforts were made to secure a certified interpreter before securing a noncertified interpreter.

Farah further asserts that the district court failed to follow rule 8.02 by not applying the screening standards to determine whether the rostered interpreters were also "otherwise competent." For a noncertified court interpreter to be included on the statewide roster, he or she must have:

> (1) completed the interpreter orientation program sponsored by the State Court Administrator; (2) filed with the State Court Administrator a written affidavit agreeing to be bound by the Code of Professional Responsibility for Interpreters in the Minnesota State Court System as the same may be amended from time to time; (3) received a passing score on a written ethics examination administered by the State Court Administrator; and (4) demonstrated minimal language proficiency in English and any foreign language(s) for which the interpreter will be listed . . . .

Minn. R. Gen. Pract. 8.01(b).

Here, the district court questioned all three interpreters about their qualifications prior to allowing them to interpret. All three interpreters were on the statewide roster and testified that they: had previously interpreted in many trials, had filed written affidavits

8

agreeing to be bound by the professional code, had passed the ethics examination, could demonstrate the minimal language proficiency in English, had no cultural or community concerns, and had the ability to be fair and impartial. The district court then allowed the parties to question the interpreters.

In this case, the district court thoroughly questioned the interpreters to ensure their competence and asked many of the sample qualification questions promulgated by the Minnesota Judicial Branch to discern the interpreters' qualifications. Based on the record, although the interpreters were not certified, the district court followed rule 8.02 and did not abuse its discretion in determining that they were qualified.

Lastly, Farah does not allege specific errors in the translation nor point out any tangible prejudice in the translation by the noncertified interpreters. On appeal, the defendant has the burden of proving that the interpretation was inadequate. *State v. Her*, 510 N.W.2d 218, 222 (Minn. App. 1994), *review denied* (Minn. Mar. 15, 1994). In sum, the district court did not abuse its discretion by appointing noncertified, rostered interpreters. *See id.* at 223 (affirming conviction when the translation may have inadvertently benefitted the state because defendant could not show tangible prejudice for the specific errors identified); *State v. Montalvo*, 324 N.W.2d 650, 652 (Minn. 1982) ("We cannot presume . . . that the interpreter did not adequately interpret the trial.").

**Affirmed.**